IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DOROTHEA B. PERKINS,<br><br>Plaintiff,<br><br>v.<br><br>PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY,<br><br>Defendant. | ) | 1:22-cv-890 |

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Before this court is Defendant's Motion for Judgment on the Pleadings, (Doc. 33). For the reasons stated herein, Defendant's motion will be granted.

## I. FACTUAL BACKGROUND

Because this court's September 30, 2025 Order dismissing the Secretary of the United States Department of Education as a Defendant recited the facts of Plaintiff's 325-page complaint, (Doc. 28 at 1–8)[1], a summary of the key facts relevant to Defendant Pennsylvania Higher Education Assistance Agency's ("Penn Ed" or "PHEAA") motion is set forth below.

---

[1] All citations in this Memorandum Opinion and Order to documents filed with this court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

In 1991, pro se Plaintiff Dorothea B. Perkins "responded to a brochure left at law schools by the Pennsylvania Higher Education Assistance Agency." (Doc. 1-2 at 34.) This brochure "advertised PHEAA's Law Access Program nationwide." (Id.) After graduating from law school in 1994, Plaintiff "was contacted by PHEAA's unregistered aliases," which "pretended they were authorized loan servicers who assist banks in making Law Access-branded federal student loans." (Id. at 35.) During law school these "unregistered aliases mailed pre-printed applications for false federal Law Access loans and private Law Access loans to me that included banks named by PHEAA, followed by pre-printed promissory notes with the banks' names." (Id.) In 1995, the "banks and trusts named by PHEAA were silent and unreachable in January 1995 because they were both dead in 1995 due to mergers." (Id. at 36.)

This "bank records fraud scheme," (id.) is one of twenty-one theories of fraud that Plaintiff articulates in her Complaint. (See Doc. 1-1 at 75–97.) Each theory "revolves around a fake federal student loan consolidation check written by PHEAA for a non-existent Law/Ameritrust student loan program." (Id. at 12.) To effectuate this program, Plaintiff asserts that PHEAA used "numerous unregistered aliases, hidden aliases, pre-printed signatures, stamped signatures, and missing signatures," (id.),

to create "the Law Access loan claim set" that "is fraudulent." (Doc. 39 at 2.) These "aliases pressured [Plaintiff] to consolidate or default." (Doc. 1-2 at 36.) The "consolidation application/promissory note" Plaintiff received contained "pre-printed incomplete and inaccurate loan information" and "included the wrong number of claims, hid a cancellation concealed in the National Student Loan Database, and avoided disclosing interest rates." (Id. at 36–37.) Moreover, "the dot-matrix printing on the . . . promissory note showed PHEAA swapped the names of the banks [Plaintiff] tried to contact with trusts' names, without ever identify[ing] the new trust creditors." (Id. at 37.) After identifying this "Disclosure Statement fraud scheme," Plaintiff states that the "Department of Education refused to look at and advise on the PHEAA's claim set and deemed it a private matter." (Id. at 37–38.)

Plaintiff argues that the consolidation affected both the borrower and the government. (See Doc. 1-1 at 15.) While "marketed" as "federal student loans for the subject claim set," (id. at 17), Plaintiff contends that "PHEAA's unregistered Law Access Loan Program . . . could not make federally insured student loans and write student loan checks." (Id. at 19.) Thus, "PHEAA was trying to turn private loans into federal student loans through unapproved branding." (Id. at 62.) These

"unauthorized Law Access contracts," not only "pretended to be subject to procedures of the Higher Education Act, so that PHEAA could fool consumers, the Department of Education, and the courts to obtain untimely and unauthorized reinsurance money from the Department of Education," (id. at 15), but also "tricked consumers with false advice provided by PHEAA's unregistered aliases that the consumers were obligated to pay the dead banks who had no employees and never contacted the consumers, including the Plaintiff." (Id. at 19.) By combining "the banks' and trusts' names with 'Law Access," PHEAA used "aliases . . . to create blind spots around missing authorized signatories to force unwarranted inferences about the missing money trail." (Id. at 57.) Because PHEAA had what Plaintiff describes as "an impermissible cozy relationship with the Department of Education," (id. at 56), the two "conspired . . . to administer PHEAA's unregistered Law Access Program using fake Check 150385 to continue collecting from the Plaintiff currently." (Id. at 56–57.)

The "missing money trail" did not end with consolidation. (Doc. 39 at 2.) Plaintiff asserts that "PHEAA left accounts open in the fictionalized money trail so that the Plaintiff would have to contact PHEAA and detrimentally rely on the advice given by PHEAA's unregistered aliases." (Doc. 1-1 at 124.) By leaving

accounts open, along with "PHEAA recording false registration numbers, false party names, false checks and no bank records," PHEAA "gaslit the Plaintiff, regulators, the court, and PHEAA's court counsel about the public's interest in the claim set." (Id. at 148.) Plaintiff also asserts that "the subject Law Access loan claim set" was impermissibly assigned to PHEAA, and that PHEAA itself impermissibly assigned "the claim set to the Department of Education," (Doc. 1-2 at 14), which "falsely reported an assignment from PHEAA," (Doc. 1-1 at 132). The assignment was made possible because "[t]he Defendants changed the assignment of rights procedures so that concealment of the entire money trail persists." (Id. at 131.)

These actions, according to Plaintiff, resulted in payments to PHEAA, (id. at 87), and collections against Plaintiff, (id. at 105-106). In 2005, Plaintiff reports learning that "PHEAA was paid reinsurance by the Department of Education in 2001." (1-2 at 42.) Then in 2008, "PHEAA misused the court system to legitimize the unsigned Check 150385 to obtain a second reinsurance payment from the Department of Education." (Doc. 1-1 at 50-51.) Plaintiff also states that PHEAA garnished her wages in 2005 and 2006, but the garnishments were "not based on bank records or eligible lender bank activity." (Id. at 105-106.) Then, the "Department of Education garnished and intercepted the

Plaintiff's 2016 federal tax refund." (Id. at 106.) This 2016 garnishment occurred "after the 2015 Hearing Decision based on unsigned Check 150385," where "[t]o justify using fake Check 150385 to collect without an authorized reinsurance payment, the Department of Education changed the procedure for holding a hearing for a Law Access loan." (Id.) The "secret Hearing involved contradictory claim set consideration reports and a controversy over the amounts and dates of reinsurance payments without bank records to amortize." (Id. at 107.) These discrepancies existed because "PHEAA's Reinsurance Fraud Scheme served to give the impression banks consolidated their own federal student loans by paying off their own claims using consolidation Check 150385, followed by insurance and reinsurance payments." (Id.)

In total, Plaintiff "noted and counted 181 bluffs; 99 computer overrides; bank federal identity thefts; conflicts of interest; unauthorized branding; poor document imaging; mismatched state and federal records; missing documents; 1,035 blind spots; numerous aliases; a silence scheme; document destruction; an accumulation of 1,078 missing requirements; and more." (Doc. 1-2 at 51–52.) As a result of the twenty-one fraud schemes, Plaintiff asserts twenty-two claims which this court identified in its previous Order. (Doc. 28 at 6–7.) Because this

court dismissed the Secretary of the United States Department of Education as a Defendant, (id. at 24), this court will consider each claim as alleged against Defendant PHEAA.

## II. PROCEDURAL HISTORY

On September 12, 2022, Plaintiff filed her claims in state court. (Doc. 1-1 at 2.) The case was removed to this court on October 19, 2022, (id. at 1), and PHEAA answered the Complaint on October 26, 2022, (Doc. 7). Following this court's dismissal of the other named Defendant, (Doc. 28), PHEAA filed a Motion for Judgment on the Pleadings, (Doc. 33), and supporting brief, (Doc. 34). Plaintiff responded to the motion, (Doc. 39), and PHEAA replied, (Doc. 40).

Defendant's motion is ripe and ready for ruling. A hearing is not necessary to resolve the motion.

## III. STANDARD OF REVIEW

This court applies the same standard to a Rule 12(c) motion for judgment on the pleadings as to a Rule 12(b)(6) motion to dismiss. Occupy Columbia v. Haley, 738 F.3d 107, 115–16 (4th Cir. 2013). A Rule 12(b)(6) motion tests "the sufficiency of a complaint." Butler v. United States, 702 F.3d 749, 752 (4th Cir. 2012) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). "To survive such a motion, the complaint must contain facts sufficient 'to raise a right to relief above the

speculative level' and 'state a claim to relief that is plausible on its face.'" Occupy Columbia, 738 F.3d at 116 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556–57). While this court assumes the truth of all factual allegations and draws all reasonable inferences in favor of the nonmoving party, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

When a party is proceeding pro se, her filings are "to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted). However, the principles calling for "special judicial solicitude" in viewing pro se filings "do[] not transform the court into an advocate." United States v. Wilson, 699 F.3d 789, 797 (4th Cir. 2012) (internal quotation marks and citation omitted). This court cannot "conjure up questions never squarely

presented to" it, nor can it "be expected to construct full blown claims from sentence fragments." Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). This is particularly relevant where, like here, Plaintiff is a law school graduate with legal training and familiarity with the legal system. See Polidi v. Bannon, 226 F. Supp. 3d 615, 616 n.1 (E.D. Va. 2016) (collecting cases).

## IV. ANALYSIS

Defendant argues that "[a]ll of Plaintiff's claims against PHEAA are barred by the doctrine of collateral estoppel because the legitimacy of the consolidation loan at issue in this lawsuit has already been adjudicated in PHEAA's favor." (Doc. 34 at 8.) The doctrine of collateral estoppel "is a subset of the res judicata genre" that "forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [collateral estoppel] is asserted had a full and fair opportunity to litigate." In re Microsoft Corp. Antitrust Litig., 355 F.3d 322, 326 (4th Cir. 2004) (quoting Sedlack v. Braswell Servs. Group, Inc., 134 F.3d 219, 224 (4th Cir. 1998)). When the prior issue was litigated in federal court, federal principles of collateral estoppel apply to the issue before the court. Scott v. Metro. Health Corp., 12-

CV-383, 2013 WL 4520264, at *5 (E.D.N.C. Aug. 23, 2013), aff'd, 564 F. App'x 698 (4th Cir. 2014). Defendant, as the "party seeking to rely on the doctrine of collateral estoppel," must establish five elements:

> (1) that "the issue sought to be precluded is identical to one previously litigated" ("element one"); (2) that the issue was actually determined in the prior proceeding ("element two"); (3) that the issue's determination was "a critical and necessary part of the decision in the prior proceeding" ("element three"); (4) that the prior judgment is final and valid ("element four"); and (5) that the party against whom collateral estoppel is asserted "had a full and fair opportunity to litigate the issue in the previous forum" ("element five").

Collins v. Pond Creek Mining Co., 468 F.3d 213, 217 (4th Cir. 2006) (quoting Sedlack, 134 F.3d at 224).

Defendant argues that each element is satisfied because "the existence and legitimacy of the consolidation loan was adjudicated more than twenty years ago by the United States Bankruptcy Court for the Middle District of North Carolina in PHEAA's favor." (Doc. 34 at 8.) Both cases, according to Defendant, are "premised on the nonexistence/illegitimacy of the consolidation loan." (Id. at 9.) While "the exact theory of nonexistence/illegitimacy has seemingly evolved," Defendant argues that "[t]he foundation of Plaintiff's Complaint and all of her claims is that the consolidation loan does not exist and, as a result, all actions taken subsequent to the 'fake'

consolidation were improper." (Id. at 9-10 (citing Doc. 28 at 3-4).)

Along with the "identical" issue of the "existence/ legitimacy of the consolidation loan," (id. at 10), Defendant contends that the four other collateral estoppel elements are satisfied. For element two, Defendant explains that "PHEAA obtained a Judgment against Plaintiff in her adversary proceeding where she challenged the existence/legitimacy of the consolidation loan" and "the Bankruptcy Court determined the consolidation loan existed." (Id.) For element three, Defendant identifies Plaintiff's "attempt[] to discharge her law school loans" through Chapter 7 Bankruptcy. (Id.) The "challenge" to the "existence of the consolidation loan" was "specifically rejected" as "one of three explicit issues that was critical and necessary to determining whether Plaintiff's education debts could be discharged." (Id. at 11.) For element four, Defendant states that the court's judgment "was final and did not proceed to trial" and "Plaintiff did not appeal." (Id.) For element five, Defendant maintains that the "judgment was the product of a complete adversarial proceeding in which Plaintiff was able to conduct discovery and present all arguments and evidence available to her to prove that the consolidation loan did not exist/was illegitimate." (Id. at 12.)

Plaintiff contends that "PHEAA fails on all five prongs of the collateral estoppel test." (Doc. 39 at 18.) "Because PHEAA generated and controlled all the documents created," Plaintiff argues that "the bankruptcy court erroneously found a dead bank was paid insurance when there was no insurance payment of bank record." (Id. at 18–19.) Moreover, "[c]ollateral estoppel should not be found because PHEAA refused to file a proof of claim for challenge." (Id. at 19.) Because "PHEAA concealed four consolidation dates and more," Plaintiff asserts that "PHEAA's records must be removed." (Id.) Plaintiff also claims that "the bankruptcy court is a different kind of court with different procedures which makes it clear the circumstances are different." (Id.) Plaintiff explains that "[t]he facts are different" such that "Plaintiff did not know the consolidation check had not been cashed; that no bank was involved or had a record; that PHEAA was the hidden original lender; or that PHEAA had already paid themselves reinsurance." (Id.) These facts, according to Plaintiff, meant that the "judgment wasn't 'valid and final' in a just sense." (Id.) Instead, the "judgment's lack of integrity makes the judgment void or voidable." (Id.) Thus, the "bankruptcy court decision was merely advisory because it was based on fraud committed and concealed by PHEAA, who was not a real party in interest." (Id.)

Construing Plaintiff's challenges to collateral estoppel liberally, as is required for a party proceeding without counsel, see Erickson, 551 U.S. at 94, Plaintiff's twenty-one theories of fraud can be categorized into four variations based on time and the actors involved. First, Plaintiff argues that PHEAA, in 2004, committed fraud on the bankruptcy court. PHEAA, according to Plaintiff, "intentionally corrupted the judicial process itself, going beyond mere perjury or incorrect facts." (Id. at 14.) By using "tricky language in the Affidavit, PHEAA's attorneys committed fraud in seven ways." (Id.) Second, Plaintiff argues that the court, in 2004, did not consider certain evidence of fraud. Plaintiff contends that "PHEAA's document custodian did not disclose contradictory evidence to the court, like the single note marked 'paid in full' and the cover letter; the trust owners name; and Law Access activity." (Id. at 10.) Third, Plaintiff argues that certain evidence of fraud was not discovered until after the 2004 bankruptcy proceeding. For example, Plaintiff asserts in her Complaint that a 2014 audit report revealed "promissory notes . . . that were alleged to be destroyed or somehow missing without a Missing Records Report during the 2004 In Re Perkins Litigation." (Doc. 1-1 at 107-08.) Fourth, Plaintiff argues that she now pleads theories of fraud beyond the issues considered by the court in

2004. Plaintiff explains that she "never litigated PHEAA's fraud, Disclosure Statement identity theft, and deception." (Doc. 39 at 18.)

This court finds that Plaintiff is collaterally estopped from pursuing claims premised on her educational debt consolidation loan. As explained in this court's previous order, the United States Bankruptcy Court for the Middle District of North Carolina "held that with respect to the consolidation loan, there was 'no question of fact regarding the existence of an educational loan debt.'" (Doc. 28 at 4 n.3 (quoting In re Perkins, No. 03-80777C-7D, 03-9075, 2004 WL 3510116, at *2 (M.D.N.C. Br. May 20, 2004)). The bankruptcy court explained:

> The record contains a copy of a promissory note for a consolidation loan signed by Plaintiff in February 1995, and Plaintiff has admitted signing such a promissory note. The affidavit of Ms. Diane Perneta, an Administrative Officer with PHEAA, states that the promissory note evidences the consolidation loan that Plaintiff received on May 3, 1995 in the amount of $44,205.46. Plaintiff argues that the consolidation loan was never made as she never received proof of the consolidation. However, the record contains a disclosure statement sent by the lender, which Plaintiff admits to receiving, that included a copy of the check used to pay off the Plaintiff's pre-consolidation student loans, a list of such pre-consolidation student loans, and a statement of the amounts paid on each of the consolidated student loans. Although Plaintiff now questions whether the consolidation loan occurred, Plaintiff sent a letter to the lender on October 27, 1995, requesting that the consolidation of her student loans be rescinded. When her request was denied, she requested and was granted

> the first of several forbearances on the consolidation loan.
>
> Plaintiff's argument that the consolidation loan was not made in May 1995 appears to rest on the fact that she received a copy of a promissory note for one of her original student loans marked paid in full on 3-21-96, and on the fact that an unnamed "disgruntled employee" of PHEAA informed Plaintiff that her student loans had not been properly consolidated. While Plaintiff contends that the consolidation loan was never made, Plaintiff admits that she has never been contacted by any lender regarding payment on the multiple student loans she took out to finance her legal education. Even when the facts are taken in the light most favorable to the plaintiff, this court has concluded that there is insufficient evidence to raise a disputed issue of material fact as to whether an educational loan exists.

In re Perkins, 2004 WL 3510116, at *2-3 (emphasis added). Applying the elements of collateral estoppel to the bankruptcy court's determination, this court finds that each element is satisfied.

For the first element, Plaintiff's action to "discharge educational debts" required the bankruptcy court to find "whether student loan debt exists" and "whether the debt is owed to, insured by, or guaranteed by a governmental agency or non-profit institution." Id. at *2. Thus, the existence of Plaintiff's educational debt consolidation loan from PHEAA was an element central to the bankruptcy proceedings. Just as Plaintiff now argues that the case before this court "revolves" around a "fake federal student loan consolidation check," (Doc.

1-1 at 12), Plaintiff argued then that "her student loans had not been properly consolidated" and the "consolidation loan was never made." In re Perkins, 2004 WL 3510116, at *2. The court rejected such arguments because Plaintiff "admitted signing such a promissory note," admitted to receiving "a disclosure statement sent by the lender," requested and received "several forbearances on the consolidation loan," and had "never been contacted by any lender regarding payment on the multiple student loans she took out to finance her legal education." Id. at *2-3. Because Plaintiff, both then and now, argued the nonexistence of the same loan issued by the same Defendant, this court finds the first element satisfied.

Second, the bankruptcy court actually resolved the issue. In addition to the reasons stated above, the court found Plaintiff's evidence "that she received a copy of a promissory note for one of her original student loans marked paid in full on 3-21-96" insufficient. Id. at *3. Plaintiff continues to make similar arguments before this court, contending that PHEAA failed to "keep a copy of the cover letter for the note marked 'paid in full'" and "[a]ny Federal Fund financial activity and any note marked 'paid in full' would be based on unsigned consolidation Check 150385." (Doc. 1-1 at 40-41.) Thus, Plaintiff not only relitigates the issue with evidence already

considered and rejected by the bankruptcy court, but in making these arguments reaffirms the consolidation check as the "crux" of any claims. McCray v. Samuel I. White, P.C., No. CV 18-3491, 2019 WL 6895986, at *4 (D. Md. Dec. 18, 2019), aff'd sub nom., 837 F. App'x 244 (4th Cir. 2021). Because the bankruptcy court found, at summary judgment and after discovery, that "there is no question of fact regarding the existence of an educational loan debt," In re Perkins, 2004 WL 3510116, at *2, this court finds the second element satisfied.

Third, resolution of the debt was critical and necessary to the prior judgment. As explained by the Fourth Circuit, the facts and issues resolved by prior proceedings must be more than merely "supportive of" the prior judgment. In re Microsoft, 355 F.3d at 327. The bankruptcy court identified three elements necessary for a "debtor to discharge educational debts." In re Perkins, 2004 WL 3510116, at *2. In finding the first element of "whether student loan debt exists," id., the court "made the necessary determination" that Defendant provided a consolidation loan upon Plaintiff signing a promissory note. Afzal v. Aslam, No. CIV. 11-395, 2011 WL 2457682, at *2 (D. Md. June 15, 2011), aff'd, 467 F. App'x 189 (4th Cir. 2012). Had the court determined that Plaintiff raised a disputed issue of material fact on the existence of the loan, the court could not have

granted summary judgment or eventually considered the "portion of the debt, if any, which is dischargeable." In re Perkins, 2004 WL 3510116, at *4. This court therefore finds the third element satisfied.

Fourth, the judgment is final and valid. "For purposes of res judicata, a summary judgment has always been considered a final disposition on the merits." Adkins v. Allstate Ins. Co., 729 F.2d 974, 976 n.3 (4th Cir. 1984) (collecting cases). Fifth, Plaintiff had a full and fair opportunity to litigate the existence of the debt. Plaintiff "participated in a sophisticated legal setting in two levels," In re Swilley, 295 B.R. 839, 846 (Bankr. D.S.C. 2003), first when challenging Defendant's motion for summary judgment on the debt's existence, In re Perkins, 2004 WL 3510116, at *1, and second when arguing that the debt was dischargeable. In re Perkins, 318 B.R. 300, 313 (Bankr. M.D.N.C. 2004). Plaintiff not only engaged in discovery, but states in her Complaint that she "learn[ed] of PHEAA's branding fraud scheme in 2004 during court discovery." (Doc. 1-2 at 41.) This court therefore finds all five elements satisfied.

This court finds Plaintiff's arguments against collateral estoppel unconvincing. From the four variations of the twenty-one fraud theories noted above, the first two variations address

conduct occurring during the proceedings.[2] For example, Plaintiff asserts that Defendant "polluted the judicial machinery" with its "treatment of the fake consolidation check." (Doc. 39 at 16.) Because of the "seven ways" Defendant "committed fraud on the bankruptcy court," (id. at 14), "[t]he court was infected," (see Doc. 1-3 at 28, 69, 120, 151, 177, 210, 280), and it "fictionalized that PHEAA paid dead Society National bank at some point." (Doc. 1-1 at 123.) Plaintiff's Complaint indicates that she not only knew of some alleged fraud at the time of the proceedings, (see Doc. 1-2 at 41 ("I was surprised to learn of PHEAA's branding fraud scheme in 2004 during court discovery")), but that she argued fraud to the bankruptcy court, (see id. ("I . . . believed the missing signatures and unknown authorized signatories revealed fraud sufficiently"); Doc. 1-2 at 252 ("in 2004 . . . the judiciary reviewed sixteen (16) things out of place on each 'Law Access' application")). Thus, if Plaintiff was aware of fraud at the time of the proceedings, this court finds that Plaintiff is relitigating an unsatisfactory decision and agrees with Defendant that "Plaintiff did not appeal the Bankruptcy Court's judgment and any attempt to challenge it now would be more than twenty years too late." (Doc. 34 at 11.)

[2] Plaintiff's third and fourth arguments relate to conduct occurring after the proceedings, which this court will address in its discussion of untimely filed claims.

Additionally, even if Plaintiff did not have evidence of the alleged fraud until after the proceedings, (see, e.g., Doc. 1-1 at 27, 108, 125), this court again agrees with Defendant that "Plaintiff never made any motion with the Bankruptcy Court" to "relieve a party from judgment due to fraud on the Court" under the Federal Rules of Civil Procedure. (Doc. 40 at 2.) Any "irregularities" must be raised in a timely and procedurally proper manner through the original proceedings, not through collateral proceedings. See McCray, 2019 WL 6895986, at *4. Thus, any fraud-based arguments relating to Defendant's conduct or the court's findings at the time of the bankruptcy proceedings are untimely raised in an improper posture.

This court also rejects Plaintiff's arguments that collateral estoppel should not apply because of the nature of the bankruptcy court and its proceedings. Plaintiff asserts that the Department of Education should have been a defendant in the bankruptcy proceedings. (Doc. 39 at 10.) Notwithstanding the fact that Plaintiff filed the suit in bankruptcy court, (see id.), courts have held that the inclusion of parties "does not change the fact that the . . . previously dismissed suits included the exact same issues of fact asserted here." Gordon v. Cathey, No. 3:13-CV-00229, 2013 WL 5561642, at *4 (W.D.N.C. Oct. 8, 2013). Plaintiff also argues that "bankruptcy court is a

different kind of court with different procedures which makes it clear the circumstances are different." (Doc. 39 at 19.) To the contrary, the Fourth Circuit has maintained that "collateral estoppel precludes relitigation of those matters actually considered and decided by the bankruptcy court." 1616 Reminc Ltd. P'ship v. Commonwealth Land Title Ins. Co., 778 F.2d 183, 187 (4th Cir. 1985); see also In re Urb. Broad. Corp., 401 F.3d 236, 244–45 (4th Cir. 2005). It makes no difference that the bankruptcy court considered the issue in the context of discharging a debt, for collateral estoppel bars successive litigation "even if the issue recurs in the context of a different claim." Taylor v. Sturgell, 553 U.S. 880, 892 (2008).

Plaintiff's next argument that "[t]he bankruptcy court decision was merely advisory because it was based on fraud committed and concealed by PHEAA, who was not a real party in interest," (Doc. 39 at 19), is belied by the proceedings that followed the bankruptcy court's summary judgment order. As the court explained in its summary judgment order, "[r]emaining for trial will be a determination of the amount of student loan indebtedness, and the portion of the debt, if any, which is dischargeable." In re Perkins, 2004 WL 3510116, at *4. In a later memorandum opinion finding that "Plaintiff has failed to establish that requiring her to pay student loans would

constitute an undue hardship," the court explained that an "adversary proceeding came before the court for trial on September 30, 2004." In re Perkins, 318 B.R. at 303. The court's opinion on a substantial controversy over Plaintiff's debts, whereby both parties participated with adverse interests in its dischargeability, reveals that the preceding order granting summary judgment on the issue of the debt's existence, which Plaintiff challenged, was not an advisory opinion.

This court therefore finds that the doctrine of collateral estoppel precludes Plaintiff from relitigating the validity or legitimacy of her educational debt consolidation loan.

Next, to the extent the Complaint alleges claims that do not "revolve[] around a fake federal student loan consolidation check written by PHEAA," (Doc. 1-1 at 12), this court finds that

the claims are barred by any applicable statutes of limitation.[3] Moreover, Plaintiff fails to plausibly state facts sufficient to infer a continuing violation or support the doctrines of equitable tolling and fraudulent concealment.

Defendant argues that all of Plaintiff's claims are "untimely under the applicable statutes of limitation." (Doc. 34 at 16–17.) Citing this court's previous Order, Defendant explains that "the last conduct specifically alleged against PHEAA was the 2008 assignment of the consolidation loan to the DOE." (Id. at 17 (citing Doc. 28 at 5).) Because "[t]he longest statute of limitation governing any of Plaintiff's claims is six years," (Doc. 40 at 3–4), and "[a]fter 2008, all collection activity, garnishments, administrative proceedings, etc. concern

[3] Many of the claims that Plaintiff asserts in her Complaint do not have a private right of action. See Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls., 781 F.3d 161, 169 (4th Cir. 2015) (recognizing that under the Higher Education Act "nearly every court to consider the issue" "agrees that there is no express private right of action" (internal quotation marks omitted)); Kerpen v. Metro. Washington Airports Auth., 907 F.3d 152, 160 (4th Cir. 2018) (finding "fatal" the plaintiff's failure to establish a defendant "as a federal entity" under the Administrative Procedure Act); Swanson v. King, No. 7:21-CV-80, 2021 WL 3856454, at *3 (E.D.N.C. Aug. 27, 2021) ("The Fifth Amendment restricts only governmental action, and not the actions of private entities." (citing Pub. Utils. Comm'n v. Pollak, 343 U.S. 451, 461 (1952))). Therefore, assuming Plaintiff asserts these claims against PHEAA, and that PHEAA is a government entity, this court will apply a six-year statute of limitation for Plaintiff's claims. See Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 186 (4th Cir. 1999).

allegations regarding DOE's conduct," (id. at 4), Defendant asserts that "all of Plaintiff's claims against PHEAA would . . . be barred by the statutes of limitation." (Id. at 5.) Additionally, "even if there were some articulable theory of liability that could link PHEAA to the DOE's actions after assignment," Defendant states that "this Court has already acknowledged that the last action allegedly taken by the DOE was March 30, 2016, which would still render all of Plaintiff's claims untimely." (Id. (citing Doc. 28 at 23).)

Assuming Plaintiff plausibly alleged that Defendant is a government entity, Plaintiff's Takings Clause, Administrative Procedure Act, and Higher Education Act claims, to the extent a private right of action exists, are subject to a six-year statute of limitations. See infra note 3. Plaintiff's federal civil Racketeer Influence and Corrupt Organizations Act (RICO) claims are subject to a four-year statute of limitations. CVLR Performance Horses, Inc. v. Wynne, 792 F.3d 469, 476 (4th Cir. 2015). Plaintiff's North Carolina RICO claims are subject to a five-year statute of limitations. See N.C. Gen. Stat. § 75D-9. Plaintiff's Fair Debt Collection Practices Act (FDCPA) claims are subject to a one-year statute of limitations. Jackson v. Ocwen Loan Servicing, LLC, 747 F. App'x 159, 160 (4th Cir. 2019) (citing 15 U.S.C. § 1692k(d)). Plaintiff's North Carolina unfair

and deceptive trade practices claims, all alleged under Chapter 75 of the North Carolina General Statutes, are subject to a four-year statute of limitations. Williams v. HomEq Servicing Corp., 184 N.C. App. 413, 420, 646 S.E.2d 381, 386 (2007) (citing N.C. Gen. Stat. § 75-16.2). Plaintiff's voidable contracts claim and actual fraud claim are subject to a three-year statute of limitations. Christenbury Eye Ctr., P.A. v. Medflow, Inc., 370 N.C. 1, 7 n.4, 802 S.E.2d 888, 892 (2017) (citing N.C. Gen. Stat. § 1-52(1), (9)).

This court finds Plaintiff's claims, to the extent they are not precluded by the doctrine of collateral estoppel, are untimely filed. For many of the claims listed above, the statute of limitations "begins to run" when the violative conduct occurs. See, e.g., Richardson v. Shapiro & Brown, LLP, 751 F. App'x 346, 349 (4th Cir. 2018). For such claims, assuming that Defendant's actions could be connected to the Department of Educations' actions in March 2016, and applying the longest statute of limitations of six years, no claim would be timely filed by the time of the Complaint on September 12, 2022, (Doc. 1-1 at 3).

For other claims, the statute of limitations does not accrue until the aggrieved party discovers the facts giving rise to the claim. See, e.g., Hyde v. Taylor, 70 N.C. App. 523, 528,

320 S.E.2d 904, 908 (1984). The Complaint indicates that Plaintiff "learn[ed] of PHEAA's branding fraud scheme in 2004 during court discovery." (Doc. 1-2 at 41.) Construed liberally, however, Plaintiff's third and fourth variations of the twenty-one fraud theories relate to conduct alleged to have occurred outside the bankruptcy litigation, including evidence "disclosed" after 2004, (see, e.g., Doc. 1-1 at 190), and claims never litigated before the bankruptcy court, (see Doc. 39 at 18). Thus, for the claims with a discovery rule for the statute of limitations, Plaintiff's allegations plausibly begin to run after the 2004 bankruptcy litigation and the 2008 assignment from PHEAA to the Department of Education. That said, this court finds that Plaintiff's claims are untimely under a discovery rule because the Complaint establishes that by July 2015 Plaintiff received information that "confirmed" Defendant's fraudulent activity. (Doc. 1-2 at 44.)

The Complaint articulates three occasions where Plaintiff received information that "revealed" the fraud schemes. (See Doc. 1-1 at 41, 135, 238.) The first is described as "PHEAA's May 21, 2014 Bowman Report," where PHEAA provided information "in response to Plaintiff's 2014 detailed audit request." (Id. at 135.) According to Plaintiff, this report disclosed "that the banks PHEAA named on the 1995 Law Access consolidation

application/promissory note merged." (Doc. 1-2 at 37.) It also confirmed "that PHEAA provided an undocumented assignment to the Department of Education on an assignment date which was later than the date of assignment reported by the Department of Education." (Doc. 1-2 at 41.) The report also provided "concealed promissory notes," (Doc. 1-3 at 21), which "revealed that PHEAA deliberately did not make and provide a full set of copies of any Law Access-branded promissory notes marked 'paid in full' for the claim set for the authority to collect on the 1995 consolidation claim." (Doc. 1-1 at 41.) For Plaintiff, this report "confirmed PHEAA defied the 2004 court Order compelling PHEAA's historical record by withholding vital promissory notes that revealed clues of the banks' deaths and lack of federal registration." (Doc. 1-2 at 44.)

The second set of information came from the Department of Education's "2015 Freedom of Information Act Request Response" which "exposed that there were no authorized reinsurance payments." (Doc. 1-1 at 217.) In this response, Plaintiff "found that the Department of Education's employees were keeping federal data in unnamed databases of false statements made to the Plaintiff during the Plaintiff's requests for audits and documents so that Plaintiff's requests would be ignored, resulting in impermissible runaround." (Id. at 97-98.) Plaintiff

also asserts that the report "revealed" a "fake entry" created by the Department of Education "that created a false impression about the Plaintiff's audit request." (Doc. 1-2 at 11-12.)

Following the information that "exposed that there was no authorized reinsurance payment," (Doc. 1-1 at 217), Plaintiff received a "Debt Statement" from the Department of Education "confirming there was no insurance payment or reinsurance payment or transfer or physical delivery relating to the subject Law Access loan claim set." (Id.) This Debt Statement was "dated July 10, 2015" and "the Department of Education admitted that the subject claim set is time-barred because no insurance payment, reinsurance payment, or transfer occurred." (Id. at 68.) In other words, the Department of Education "recanted" the "insurance payment and transfer stories," (id. at 93), by "admitt[ing] . . . that the federal reports of a transfer having taken place were false." (Id. at 135.)

The North Carolina Supreme Court has maintained that the "discovery rule is an objective standard, not a subjective one." Taylor v. Bank of Am., N.A., 385 N.C. 783, 789, 898 S.E.2d 740, 746 (2024). This rule "tolls the statute of limitations only until a reasonable person should have discovered the fraud under the circumstances and in the exercise of reasonable prudence." Id. As such, "[t]he particular moment that a specific plaintiff

alleges he actually discovered the fraud is irrelevant." Id. (emphasis in original). While the Complaint arguably alleges that the fraud was sufficiently discovered in 2004, (see Doc. 1-2 at 41), it makes clear that Plaintiff believed her theories were confirmed by July 2015. Thus, the statute of limitations began to run by Defendant's Disclosure Statement, making Plaintiff's claims before this court untimely.

The timing of Plaintiff's discoveries also defeats Plaintiff's arguments for a continuing violation, equitable tolling, or fraudulent concealment. Plaintiff asserts several arguments against application of the statute of limitations. For example, she maintains that "[f]raud on the court nullifies the statute of limitations," (Doc. 39 at 15), "[n]o statute of limitations allows PHEAA to knowingly maintain fraudulent records," (id. at 17, 18), and "[t]he records PHEAA still maintains must be removed as a source of inaccurate information and financial statements used for continuing fraud." (Id. at 15.) Construed liberally, Plaintiff argues that her claims are not barred by the statutes of limitation under a continuing violation theory, the doctrine of equitable tolling, and the doctrine of fraudulent concealment.

Starting with fraudulent concealment and Plaintiff's contention that "[f]raud on the court nullifies the statute of

limitations," (id.), this court finds that Plaintiff's claims are untimely even if the elements were satisfied. The Fourth Circuit has recognized that "pursuant to this doctrine, 'when fraud has been concealed or is of such a character as to conceal itself,' and the plaintiff is not negligent or guilty of laches, the limitations period does not begin to run until the plaintiff discovers the fraud." Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 122 (4th Cir. 1995) (emphasis added) (quoting Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349 (1874)); see also Badaracco v. Comm'r, 464 U.S. 386, 402, 104 S. Ct. 756, 766, 78 L. Ed. 2d 549 (1984) (Stevens, J., dissenting) ("Fraud did not entirely repeal the bar of limitations; rather the period of limitations simply did not begin to run until the fraud was discovered, or at least discoverable.") (citing Exploration Co. v. United States, 247 U.S. 435 (1918)). Because the doctrine of fraudulent concealment, if applied, would have the same effect as claims under a discovery rule such that the claims' limitation period began to run by July 2015, this court finds that Plaintiff's claims are not timely filed.

This court also finds Plaintiff's continuing violation theory inapplicable. This theory "is occasioned by continual unlawful acts, not continual ill effects from an original violation." Nat'l Advert. Co. v. City of Raleigh, 947 F.2d 1158,

1166 (4th Cir. 1991). A violation is not a "continuing violation" if the allegations reflect "an entirely new violation." A Soc'y Without A Name v. Virginia, 655 F.3d 342, 348 (4th Cir. 2011). Here, Plaintiff asserts fraud beyond the alleged loan consolidation and reinsurance payment, contending that the "records PHEAA still maintains must be removed as a source of inaccurate information and financial statements used for continuing fraud." (Doc. 39 at 15.) To the extent maintenance of records is not an "entirely new violation," A Soc'y Without A Name, 655 F.3d at 348, courts have recognized that "a failure to provide notice or provide information or documents as required is not treated as a continuing violation." Hartquist v. Emerson Elec. Co., No. 11-CV-1067, 2016 WL 1312028, at *7 (M.D.N.C. Mar. 31, 2016) (collecting cases). Additionally, even if Plaintiff's continuing violation theory was both recognized and not an entirely new violation, courts have maintained that "[i]f the continuing violation doctrine is implicated, the limitations period begins to run at the time of the last violation." Id. (collecting cases). Therefore, this court finds that a continuing violation theory could not support Plaintiff's time-barred claims.

Equitable tolling is "reserved for those rare instances where – due to circumstances external to the party's own conduct

– it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000). This doctrine does not "extend to garden variety claims of excusable neglect." Rouse v. Lee, 339 F.3d 238, 246 (4th Cir. 2003). Courts have recognized that, in the context of student debt relief cases, "allegations of government harassment" when asserted through "conclusory statements" are "not entitled to the assumption of truth, and thus are not a basis for equitable tolling." Winston v. U.S. Dep't of Educ., No. 8:22-CV-01965, 2023 WL 8452451, at *7 (D. Md. Dec. 6, 2023).

The Fourth Circuit clarified the distinction between equitable tolling and other equitable doctrines used to provide relief from a limitations period. In Edmonson v. Eagle National Bank, the Fourth Circuit recognized that equitable tolling is "substantively different and therefore subject to different pleading and proof standards" than fraudulent concealment. 922 F.3d 535, 550 (4th Cir. 2019) (emphasis in original). Where fraudulent concealment considers "the defendant's wrongful acts of concealment" such that "the plaintiff is not aware of the facts giving rise to his claim within the limitations period," equitable tolling "focuses on whether there was excusable delay by the plaintiff." Id. at 549 (quoting Johnson v. Henderson, 314

F.3d 409, 414 (9th Cir. 2002)). Equitable tolling "differs from" other doctrines "in that does not assume a wrongful – or any – effort by the defendant to prevent the plaintiff from suing." Id. (quoting Cada v. Baxter Healthcare Corp., 920 F.2d 446, 451 (7th Cir. 1990)). In other words, equitable tolling "is potentially applicable when a plaintiff's failure to timely file suit is not attributable to wrongful conduct by the defendant," and a plaintiff seeks "relief based on its mistake." Id. at 550-51 (emphasis in original).

In this case, Plaintiff attributes the delays in filing to Defendant. Plaintiff asserts that "no statute of limitations applies because PHEAA committed fraud on the court." (Doc. 39 at 15.) Defendant's actions, according to Plaintiff, "were a corruption of the judicial process itself." (Id. at 16.) Plaintiff cannot, as is required for equitable tolling, claim that the failure to timely file was not attributable to Defendant while simultaneously alleging that Defendant "polluted the judicial machinery." (Id.) This court agrees with Defendant that "Plaintiff has been making the same arguments about PHEAA's allegedly improper consolidation of her student loan, ad nauseam," (Doc. 40 at 3), and continues to portray Defendant as "the hidden original lender" that "concealed" information. (Doc. 39 at 19.) Equitable tolling is thus inapplicable.

This court therefore finds that Plaintiff is collaterally estopped from relitigating the validity or legitimacy of her educational debt consolidation loan. Additionally, any claims not precluded by the doctrine of collateral estoppel are barred by any applicable statutes of limitation. Plaintiff's complaint will be dismissed with prejudice. See Burnett v. Maryland Dep't of Lab., No. CV 24-3718, 2025 WL 2720147, at *6 (D. Md. Sep. 24, 2025) (collecting cases) ("Dismissal with prejudice is the appropriate disposition when a plaintiff's claims are barred by res judicata."); Foy v. Giant Food Inc., 298 F.3d 284, 291 (4th Cir. 2002) (recognizing the district court "properly applied" the statute of limitations and dismissed the "claims with prejudice.").

## V. CONCLUSION

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendant's Motion for Judgment on the Pleadings, (Doc. 33), is **GRANTED**. Plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

Because Plaintiff's Complaint is dismissed, Plaintiff's Motion for Sanctions for Failure to Comply with Court-Ordered Mediation Deadline, (Doc. 44), is **DENIED AS MOOT.**

A judgment dismissing this action will be filed contemporaneously herewith.

This the 19th day of August, 2026.

William L. Osteen, Jr.
United States District Judge